1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| DONALD DOWELL,<br>CDCR #AA-2828, | Civil No.   09-2576 DMS (MDD) |
| Plaintiff, | **ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT PURSUANT<br>TO FED.R.CIV.P. 56(c)** |
| vs. | |
| W.T. GRIFFIN; M. BOTKIN;<br>M. ZDUNICH; IVERSON; L. JOHNSON;<br>S. ADAMS; CATHERINE MILLETT, | **(ECF No. 49)** |
| Defendants. | |

13

14

15

16

17

18

## I.

### PROCEDURAL BACKGROUND

19

20

        Donald Dowell ("Plaintiff"), a prisoner currently incarcerated at R.J. Donovan

21

Correctional Facility  in San Diego, California, is proceeding pro se and *in forma pauperis* in

22

this civil rights action filed pursuant to 42 U.S.C. § 1983.   Plaintiff claims San Diego Police

23

Department Sergeant Griffin and Officers Botkin, Zdunich, Iverson, Adams, Johnson, and

24

Millett ("Defendants"), all members of the Department's Narcotics "Team 8," violated his

25

Fourth Amendment rights on December 17, 2008 when they detained him and searched his

26

home without a warrant.  (Amend. Compl. at 4-10.)  While Defendants uncovered drugs, drug

27

paraphernalia and a weapon in Plaintiff's residence, this evidence was suppressed pursuant to

28

CAL. PENAL CODE § 1538.5 during a preliminary hearing held before San Diego Superior Court

1    Judge Charles R. Gill on January 9, 2009 because Defendants' acted upon a faulty assumption

2    that Plaintiff had a "Fourth Waiver."[1]   As a result, all criminal charges in San Diego Superior

3    Court Criminal Case No. CD217839 related to the unlawful search were dismissed.  (*Id.* at 9-

4    11.)  Plaintiff now seeks "unspecified" amounts of general and punitive damages pursuant to

5    42 U.S.C. § 1983, on grounds that Defendants violated his Fourth and Fourteenth Amendment

6    rights.  (*Id.* at 13, 15, 19.)

7            Currently before the Court is Defendants' Motion for Summary Judgment filed pursuant

8    to FED.R.CIV.P. 56 (ECF No. 49).  Because Plaintiff is now incarcerated (based on a separate

9    criminal conviction)[2] and proceeding without counsel, the Court has notified him of the

10   requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409

11   / / /

12   / / /

13

14   ─────────────────

15   [1]  A "Fourth Waiver" is a shorthand term police use to describe a person whose "reasonable
     expectation of privacy" under the Fourth Amendment has been either "significantly diminished" by a
16   condition of probation, *United States v. Knights*, 534 U.S. 112, 120 (2001), or extinguished as a
     condition of his parole.  *Samson v. California*, 547 U.S. 843, 852 n.3 (2006).  In *Knights*, the U.S.
17   Supreme Court upheld a warrantless search of a California probationer's home because it was
     "supported by reasonable suspicion *and* authorized by a condition of probation." *Id.* 534 at 122
18   (emphasis added).  In *Samson*, the Supreme Court held a California parolee may be searched without
     a warrant by a parole or other peace officer "at any time" and without any suspicion, except for purposes
19   of harassment, because he "d[oes] not have an expectation of privacy that society would recognize as
     legitimate."  *Samson*, 547 U.S. at 852.  In both *Knights* and *Samson*, the Supreme Court expressly
20   declined to hold that "the acceptance of a search condition constitutes consent in the ... sense of a
     complete waiver of [] Fourth Amendment rights.'"  *Samson*, 547 U.S. at 852 n.3; *Knights*, 534 U.S. at
21   118. And in *Knights*, the Court further refused to decide whether a probation search without reasonable
     suspicion would satisfy the Fourth Amendment.  *Knights*, 534 U.S. at 120.  However, California courts
22   have long held that "probationers may validly consent in advance to warrantless searches in exchange
     for the opportunity to avoid service of a state prison term," *People v. Woods*, 21 Cal.4th 668, 674 (1999)
23   (*citing People v. Bravo*, 43 Cal.3d 600, 608 (1987)), and after *Knights* have continued to find even a
     "suspicionless search pursuant to a probation condition is not prohibited by the Fourth Amendment."
24   *People v. Medina*, 158 Cal. App.4th 1571, 1580 (Cal. Ct. App. 5th Dist. 2008).  In this case, Defendants
     do not specify whether Plaintiff's purported "Fourth Waiver" referred to either a probation *or* a parole
25   search condition.  However, the distinction is irrelevant for purposes of this Motion because Defendants
     now concede Plaintiff was, in fact, *not* subject to any search condition at the time he was detained and
     his house was searched on December 17, 2008.

26       [2]  At the time Plaintiff was detained and his residence was searched on December 17, 2008, he
     had been released on bail and was awaiting trial on separate charges of possession, transportation and
27   sale of cocaine in San Diego Superior Court Case No. SCD214252.  Plaintiff was convicted in that case
     and is currently serving a sentence of 15 years to life as a result of that conviction.  *See People v.
28   Dowell*, 2010 WL 1732516 (Cal.App.4th 2010) (unpublished).

1    (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) (ECF No. 50).[3]

2    Plaintiff has filed an Opposition to Defendants' Motion (ECF No. 60), and Defendants have

3    filed both a Reply (ECF No. 61), as well as evidentiary objections to evidence submitted by

4    Plaintiff in support of his Opposition (ECF No. 62).

5                                             **II.**

6                               **FACTUAL BACKGROUND**

7    **A.      Plaintiff's Claims**

8            On December 17, 2008, Plaintiff alleges he left his residence at 2715 Marcy Street in San

9    Diego in a white Ford truck accompanied by a man named Washington.  (Amend. Compl. at 5.)

10   At about the 800 block of 11th Avenue, Plaintiff claims a San Diego Police car pulled behind

11   him directed him to pull over.  (*Id.* at 6.)  Plaintiff claims he was "obeying all traffic laws and

12   posted speed limits."  (*Id.*)

13          When Plaintiff pulled over, Defendant Zdunich asked for his driver's license and told

14   Plaintiff he had a broken taillight and license plate light.  (*Id.*)  Zdunich also told Plaintiff he

15   "was listed as a 4th waiver."  (*Id.*)  Plaintiff claims he denied having any such waiver.  (*Id.* at 7.)

16   Zdunich then opened the truck door, ordered Plaintiff out of the car, and "conducted an illegal

17   search" of Plaintiff's person whereby he "obtained [Plaintiff's] residence keys from his pocket

18   and $140 [in] U.S. currency."  (*Id.*)  Plaintiff claims Zdunich then placed him in the back of the

19   police car where he waited for approximately 45 minutes while Defendant Iverson arrived, took

20   Plaintiff's keys from Defendant Zdunich, and then met with Defendants Griffin, Botkin, and

21   Johnson at Plaintiff's residence where they used his keys to gain entry and conducted an

22   "illegal" search.  (*Id.* at 8-9.)

23          Plaintiff further claims the evidence found during the search of his home was suppressed

24   by a Superior Court Judge during a preliminary hearing and Case No. CD217839 was dismissed.

25   However, Defendant Millett thereafter "generated a letter to [Plaintiff's] landlord" informing

26

27          [3]   *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given
     "fair notice ... of the requirements and consequences of a summary judgment motion."  *County of Los*
28   *Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008) (citing *Rand*, 154 F.3d at 960-61).

1   him or her that San Diego Police had "conducted a narcotic investigation at the property," and

2   he was evicted. (*Id.* at 12.)

3       Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, arguing these actions violated his right

4   to be free from unreasonable search and seizure in violation of the Fourth and Fourteenth

5   Amendments. (*Id.* at 15.) Plaintiff seeks an unspecified amount of damages based on "economic

6   losses associated with the unlawful search and seizure of his person, residence and vehicles," and

7   "injuries related to the posting of bail" and his family's eviction from their home. (*Id.* at 14-15,

8   19.)

9   **B.    Defendants' Claims**

10      On December 17, 2008, Defendants Griffin, Botkin, Zdunich, Iverson and Johnson were

11  all members of the San Diego Police Department's "Team 8," an anti-narcotics unit assigned to

12  the downtown area.  (Griffin Decl. ¶¶ 5-6; Botkin Decl. ¶¶ 5-6; Zdunich Decl. ¶¶ 4, 9-10;

13  Iverson Decl. ¶¶ 3-4, Johnson Decl. ¶¶ 5-6.)  Griffin, Botkin, Zdunich, Iverson and Johnson all

14  claim Plaintiff "is a well-known drug dealer in the downtown area," and that he, in fact, had been

15  arrested ... by members of Team 8 in the summer of 2008 for selling cocaine." (Griffin Decl.

16  ¶ 8; Botkin Decl. ¶ 8; Zdunich Decl. ¶ 8; Iverson Decl. ¶ 8, Johnson Decl. ¶ 8.)

17      Sometime in November 2008, "Team 8 members received a tip that Plaintiff was dealing

18  marijuana and assaulting and robbing downtown residents." (Griffin Decl.  ¶ 9; Botkin Decl.

19  ¶ 9; Zdunich Decl. ¶ 7; Iverson Decl. ¶ 7, Johnson Decl. ¶ 9.)  Griffin, Botkin and Johnson also

20  "learned that [Plaintiff's] car (or his wife's car) was used in these incidents. (Griffin Decl.  ¶ 9;

21  Botkin Decl. ¶ 9; Johnson Decl. ¶ 9.)

22      "Officer Matthew Botkin headed up the investigation into Plaintiff's illicit activities."

23  (Griffin Decl. ¶ 10; Johnson Decl. ¶ 10.)  "Because of [his] knowledge of Plaintiff's penchant

24  for illegal activities," Botkin "ran a Fourth Amendment Waiver Search on December 4, 2008 [i]n

25  the SD-Law Database," which is maintained by the California Superior Courts.  (Botkin Decl.

26  ¶ 10.)  Botkin, Griffin, Zdunich, Iverson and Johnson all claim police "rely on this database to

27  determine whether or not a certain person is subject to a Fourth Waiver." (Griffin Decl.  ¶ 10;

28  Botkin Decl. ¶ 10; Zdunich Decl. ¶ 8; Iverson Decl. ¶ 8, Johnson Decl. ¶ 10.) Botkin specifically

1   claims to have "received specific training regarding County Computers and the SD-Law

2   Database," which covered "County computer systems that contain criminal information, criminal

3   history and court information."  (Botkin Decl. ¶ 3; Defs.' Notice of Lodgment in Supp. of Mot.

4   for Summ. J. [ECF No. 49-12] Rep.'s Tr. dated Jan. 5, 2009 "1538.5 Hearing" in *People v.*

5   *Dowell*, San Diego Superior Court Case No. CD217839 ("Defs.' Ex. 2") at 22.)  Griffin, Botkin,

6   Zdunich, Iverson and Johnson all also allege to have personally accessed the SD-Law Database

7   "approximately" or "well over" 1,000 times in each of their careers.  (Griffin Decl. ¶ 10; Botkin

8   Decl. ¶ 10; Zdunich Decl. ¶ 8; Iverson Decl. ¶ 8, Johnson Decl. ¶ 10.)

9       Botkin claims that his December 4, 2008 search of the SD-Law Database "showed that

10  Plaintiff had a Fourth Waiver."  (Botkin Decl. ¶ 11; Defs.' Notice of Lodgment in Supp. of Mot.

11  for Summ. J. ("Ex. 1") [ECF No. 49-11].)  When Botkin "entered Plaintiff's date of birth and

12  other information" and "hit 'return,'" "Plaintiff's name came up several times on the computer

13  screen."  (Botkin Decl. ¶ 12; Defs.' Ex. 1 at 2; Defs.' Ex. 2 at 23.)  On the second screen,

14  captioned "RI01 Result," and dated 12/4/2008, Plaintiff's name and date of birth appears twice,

15  once with a notation reading "HAS 4TH WAIVER."  (Defs.' Ex. 1 at 3.)  On the third screen,

16  also dated 12/4/2008 and captioned "DA09 Result," however, Plaintiff's name and date of birth

17  again appears above a list of what appear to be various criminal cases numbers.  At the top of

18  this list, there *is* a notation reading "4TH EXPIRE."  (*Id.* at 4.)  Botkin, however claims only to

19  have seen the "wording which said "HAS 4TH WAIVER" and "did not see any expiration date

20  listed" when he searched the database on December 4, 2008.  (Botkin Decl. ¶ 12; Defs.' Ex. 2

21  at 23.)  During Plaintiff's suppression hearing, Botkin testified that if a person's Fourth Waiver

22  has expired, the SD-Law Database "will show [the] expiration date if you click on the link to the

23  specific case that the Fourth waiver has been assigned."  (Defs.' Ex. 2 at 36.)  He further testified

24  that "the only thing that [he] did different[ly] on [December 17, 2008] was that [he] looked at

25  all [Plaintiff's] court cases ... to determine why [the database] no longer showed a valid Fourth

26  waiver."  (*Id.*)

27       Based on his December 4, 2008 SD-Law Database records search, "coupled with the fact

28  that Plaintiff was out on bond while he was awaiting trial," and the "illegal activities reported

to Team 8 by an informant," Botkin advised Griffin, Johnson, Zdunich and Iverson on December 17, 2008 that Plaintiff "had a Fourth Waiver," and they "had to stop [his] criminal activity." (Botkin Decl. ¶ 11; Griffin Decl. ¶¶ 10-11; Johnson Decl. ¶¶ 10-11; Zdunich Decl. ¶¶ 8-9; Iverson Decl. ¶¶ 8-9; Defs.' Ex. 2 at 32-34.)  Griffin, Johnson, Zdunich and Iverson all "relied on the representations of Officer Botkin," and "did not conduct [their] own search[es] of the SD-Law Database" because they had "no reason to doubt [him]," and the information was "coupled with the fact that Plaintiff was out on bond while he was awaiting trial" as well as informant tips to Team 8 that Plaintiff was engaging in "illegal activities." (Griffin Decl. ¶ 11; Johnson Decl. ¶ 12; Zdunich Decl. ¶ 9; Iverson Decl. ¶ 9; Defs.' Ex. 2 at 8-9.)

Thus, on December 17, 2008, members of Team 8, including Botkin, Griffin and Zdunich specifically, met at the substation "sometime between 2:00 and 3:00 in the afternoon" to discuss Plaintiff's status. (Defs.' Ex. 2 at 13, 16, 33-34, 37.)  At that time, Botkin directed Zdunich, who was a "uniformed scoop officer" to detain Plaintiff "and conduct a 4th waiver search of his person." (Zdunich Decl. ¶¶ 9-10; Defs.' Ex. 2 at 12, 34.)  Zdunich was "specifically looking" for Plaintiff while on patrol, and at approximately 5:34 p.m., Officer Adams, another member of Team 8 and someone who had "participated in [Plaintiff's previous] arrest for possession of cocaine for sale in the summer of 2008," observed Plaintiff driving a white pickup truck and called Officer Zdunich in to make a traffic stop. (Adams Decl. ¶ 3; Defs.' Ex. 2 at 14.)

In addition to being told by Botkin that Plaintiff had a Fourth Waiver, Zdunich claims he also observed the white truck Plaintiff was driving "had a cracked right taillight," which is a Vehicle Code violation. (Defs.' Ex. 2 at 8-9; Zdunich Decl. ¶ 10.) Zdunich pulled Plaintiff over, asked for his drivers' license, ordered him out of the car, and because he believed Plaintiff had a Fourth Waiver, "searched him," "took his house keys off of him, [and] placed him in the back of [his] car." (Defs.' Ex. 2 at 9-10.) Zdunich claims it was Botkin who "advised [him] to obtain Plaintiff's house keys so certain members of Team 8 could search his residence for drugs, drug paraphernalia and weapons," and Griffin who "told [him] to detain [Plaintiff] until another officer could come and take [Plaintiff's] keys. (Zdunich Decl. ¶ 11; Griffin Decl. ¶ 11; Botkin Decl. ¶ 13; Defs.' Ex. 2 at 9.)

"About 10 minutes into the stop," Officer Iverson arrived, "retrieved Plaintiff's keys" from Zdunich and took them to Plaintiff's residence on Marcy Avenue at Botkin's request. (Iverson Decl. ¶¶ 11-12; Zdunich Decl. ¶ 12; Botkin Decl. ¶ 15; Defs.' Ex. 2 at 11.)  Zdunich detained Plaintiff in the back of his patrol car for 45 minutes "until Sergeant Griffin advised [him] ... to arrest [Plaintiff] and take him back to the substation." (Defs.' Ex. 2 at 11.)

Meanwhile, at Plaintiff's Marcy Street residence, Defendants Botkin, Griffin and Johnson "knocked on the door and there was no answer."  (Griffin Decl. ¶ 14; Botkin Decl. ¶ 16; Johnson Decl. ¶ 16.)  Defendant Iverson claims once it "appeared no one was at the residence, [she] opened the front door" using Plaintiff's keys.  (Iverson Decl. ¶ 13.)  Defendant Iverson then "stood guard near the doorway to prevent something unexpected from occurring," but did not otherwise "participate in the actual search of [the] residence."  (*Id.*; Griffin Decl. ¶¶ 14-15; Botkin Decl. ¶ 17; Johnson Decl. ¶ 16.)  At the time, Griffin, Johnson and Botkin all "felt there was no need to seek a warrant because time was of the essence and [they] believed that Plaintiff had a Fourth Waiver."  (Johnson Decl. ¶ 14; Griffin Decl. ¶ 12; Botkin Decl. ¶ 14.)

In the first bedroom, Botkin, Griffin and Johnson found a "small amount of marijuana individually packaged" and citation from the San Diego Harbor Patrol, which listed Plaintiff's name, address and date of birth "in the center of an entertainment system or center."  (Defs.' Ex. 2 at 24; Botkin Decl. ¶ 18; Griffin Decl. ¶ 16; Johnson Decl. ¶ 17.)  Next to the citation, and six "individually packaged baggies of marijuana," which weighed approximately 31.93 grams, Defendants Botkin, Griffin and Johnson found a "functioning and operating" digital scale, which tested positively for cocaine residue.  (Defs.' Ex. 2 at 26.)  "On the other side of the room, in a set of drawers, [Botkin] [also] found a loaded .25 caliber Phoenix Arms/Raven Model semi-automatic handgun."  (*Id.* at 25.)  Botkin, Griffin and Johnson also claim to have found a "a large sum of money" which they returned to Plaintiff's wife when she returned home from work during the search.  (Botkin Decl. ¶ 18; Griffin Decl. ¶ 16; Johnson Decl. ¶ 17.)

While at Plaintiff's residence, Sgt. Griffin claims to have heard Officer Botkin ask Officer Adams "to re-check the database to confirm [Plaintiff] was still on probation and subject to a Fourth Waiver."  (Griffin Decl. ¶ 18.)  Griffin claims he "had the team stop their searching

pending this confirmation." (*Id.*)  Adams told Griffin, Botkin and Johnson that "the computer system now indicated [Plaintiff] was not on probation any longer." (*Id.*)  Therefore, Griffin, Botkin and Johnson "terminated [the] ... search." (*Id.*)  However, based on the evidence confiscated, Griffin "advised" Zdunich, who was still detaining Plaintiff in his patrol car, "to arrest [him] and take him back to the substation." (Defs.' Ex. 2 at 11; Botkin Decl. ¶ 19; Griffin Decl. ¶ 17; Johnson Decl. ¶ 18.)

At the Central Division Police Substation, Griffin claims yet another officer, whom he and Botkin believe was Zdunich, "ran another search of the SD-Law Database." (Griffin Decl. ¶ 18; Botkin Decl. ¶ 20.)  Botkin also checked the database after the search.  (Botkin Decl. ¶ 21.) Griffin, Botkin and Johnson were all "stunned to learn that on December 17, 2008," the day they searched Plaintiff's residence, that "the SD-Law Database ... reflected that Plaintiff's Fourth Waiver was [either] 'Expired,'" had "disappeared," or was "no longer ... in the ... database." (Griffin Decl. ¶ 19; Botkin Decl. ¶ 21; Johnson Decl. ¶ 19; Iverson Decl. ¶ 15.)  Griffin and Botkin "realized at that time that [they] had made [a] mistake." (Griffin Decl. ¶ 20; Botkin Decl. ¶ 18.)  Botkin admits he "should have checked prior to the search to determine whether Plaintiff still had a Fourth Waiver" and that he should not have "relied on [his] December 4, 2008 search of the SD-Law Database as an initial premise for [the December 17, 2008] search." (Botkin Decl. ¶ 22.)  For his part, Griffin also admits he also "should have checked [him]self prior to the search to determine whether Plaintiff still had a Fourth Waiver." (Griffin Decl. ¶ 20.)  Instead, Griffin, Johnson, Zdunich and Iverson all "relied on Botkin's December 4, 2008 search of the ... database and his representations that Plaintiff had a Fourth Waiver." (Griffin Decl. ¶¶ 11, 20; Johnson Decl. ¶¶ 10-11, 20; Zdunich Decl. ¶¶ 8-9, 16; Iverson Decl. ¶¶ 8-9.)

Plaintiff "remained in jail pending a Penal Code § 1538.5 [suppression] hearing related to his [December 17, 2008] arrest." (Defs.' P&As in Supp. of Mot. for Summ. J. at 8.)  Both Officers Zdunich and Botkin testified during that hearing, and on January 5, 2009, the evidence seized during the December 17, 2008 search of Plaintiff's residence was ordered excluded. (Defs.' Ex. 2 at 47.)  San Diego Superior Court Judge Gill determined that while Officer Zdunich's initial stop of Plaintiff was reasonable "based on the officer's testimony" that Plaintiff

had a broken taillight, the 45-minute extension of the detention was unreasonable because Plaintiff in fact, did not have a Fourth Waiver.  Judge Gill further found "there was a lack of good faith reliance" on Officer Botkin's December 4, 2008 search of the SD-Law Database to justify the search of Plaintiff's home because even if one "assumed that on December 4, 2008, there was a Fourth Waiver," there was nevertheless a "period of almost two weeks before the [December 17, 2008] search ... with no additional checking" or confirmation of Plaintiff's status. (*Id.* at 39, 43-44.)

Consequently, the charges against Plaintiff related to his December 17, 2008 arrest were dismissed in the interest of justice.  (Defs.' Ex. 2 at 44.)

## III.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.      FED.R.CIV.P. 56 Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact in dispute and the moving party has shown it is entitled to judgment as a matter of law.  *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing FED.R.CIV.P. 56(c)).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218.  To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations,"

1   *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that

2   demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in

3   the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]."   *Reese v.*

4   *Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56;

5   *Celotex*, 477 U.S. at 323); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

6   "To defeat a summary judgment motion ..., the non-moving party 'may not rest upon the mere

7   allegations or denials' in the pleadings.  FED.R.CIV.P. 56(e).  Instead, he "must establish the

8   existence of a genuine factual dispute on the basis of admissible evidence; bare allegations

9   without evidentiary support are insufficient to survive summary judgment."  *Estate of Tucker*

10  *ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008).

11  **B.     Defendants' Arguments**

12          All Defendants seek summary judgment arguing that "assuming arguendo, [] Plaintiff can

13  establish that his Fourth and Fourteenth Amendment rights were violated ..., he cannot prove,

14  given the circumstances[,] that the officers are not entitled to qualified immunity," or that "the

15  right was clearly established." (Defs.' P&As in Supp. of Mot. for Summ. J. [ECF No. 49-1] at

16  11.)  Specifically, Defendants claim they "acted with objective reasonableness when they

17  searched Plaintiff's residence," "because they believed Plaintiff had a Fourth Waiver which

18  entitled them to search his residence without a warrant." (*Id.* at 12.)  Defendants further argue

19  "probable cause existed at the time of the search," (*id.* at 13-14), and that Officers Adams,

20  Millett, Zdunich and Iverson "were not involved in the search of Plaintiff's residence or car and

21  should be dismissed." (*Id.* at 14-15.)

22          Plaintiff opposes on all grounds, and claims under penalty of perjury, that "all Defendants

23  were personally involved in the illegal misconduct," that Defendants "illegally searched [his]

24  residence and vehicles" and "ignored a legal notification" on December 4, 2008 and again on

25  December 17, 2008 that he "was not a Fourth Waiver."  Therefore, Plaintiff asserts the decision

26  to conduct a traffic stop, obtain his keys and then use them to gain access to his residence

27  without a warrant, violated his clearly established right to be free of unreasonable search and

28  seizure.  (Pl.'s Opp'n at 3-5; 11-13.)

In Reply, Defendants "do not dispute that Officer Botkin's belief [as to the existence of a Fourth Waiver] was ultimately proven mistaken after the search was completed," but argue that they are nevertheless entitled to qualified immunity because "all the officers (except Officers Millet, Adams and Zdunich who were not involved in the search of the residence in any manner) relied on the representations made by Officer Botkin which he received from the SD-Law Database and other circumstances." (Defs.' Reply [ECF No. 61] at 6.) Defendants have further filed evidentiary objections to Plaintiff's Exhibit 5, which is entitled "San Diego Police Department Procedure 4.15," "establish[ing] standardized practices for conducting probation, parole, and 'knock and talk' searches, search warrants, and high-risk entries," as well as to various statements in Plaintiff's Declaration in Support of his Opposition pursuant to FED.R.EVID. 402, 403, 602 and 901(a). (See Defs.' Objections [ECF No. 62].)[4]

### 1.    Fourteenth Amendment Claims

Plaintiff claims that Defendants violated both his Fourth and Fourteenth Amendment due process rights. (FAC at 4-5, 13-14, 19.) However, "[w]here an amendment 'provides an explicit textual source of constitutional protection against a particular sort of government behavior,' it is that Amendment, not the guarantee of due process, that 'must be the guide for analyzing the complaint.'" *Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Plaintiff alleges no factual predicate for any due process violation apart from his Fourth Amendment search claims. Thus, his claims must be analyzed under Fourth Amendment standards. *See Graham v. Connor,* 490 U.S. 386, 394-95 (1989) (analyzing unlawful seizure claim under Fourth Amendment but not under substantive due process); *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1028 (9th Cir. 2002) ("[B]ecause the Fourth Amendment supplies an explicit textual source of constitutional

---

[4] Because Plaintiff does not specifically identify the relevance of Procedure 4.15 to his claims, the Court does not rely on it, and, instead, has considered only those allegations of fact in his sworn Declaration in Opposition which are relevant and comprise matters within his own personal knowledge in order to decide Defendants' Motion. Accordingly, the Court OVERRULES each of Defendants' evidentiary objections (ECF No. 62) without prejudice at this time. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (noting that even evidence "presented in an inadmissable form" may be considered at the summary judgment stage, if "the contents of the evidence would be admissible at trial.").

1  protection against unlawful searches, that Amendment, and not the more general right to privacy,

2  governs the constitutionality of the search.").

3  **2.  Fourth Amendment Claims**

4  Defendants do not dispute that Plaintiff's Fourth Amendment rights were violated.[5]

5  Instead, they focus on the second prong of the qualified immunity analysis, and claim that

6  regardless of any constitutional violation, they are nevertheless entitled to immunity because it

7  would not be clear to a reasonable officer in each of their positions that detaining Plaintiff,

8  obtaining his keys, and searching his residence without a warrant under the circumstances was

9  a violation of clearly established law.  (*See* Defs.' Mem. of P&As in Supp. of Mot. for Summ.

10  J. at 11.)

11  **3.  Qualified Immunity**

12  "Government officials enjoy qualified immunity from civil damages unless their conduct

13  violates 'clearly established statutory or constitutional rights of which a reasonable person would

14  have known.'"  *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v.*

15  _____

16  [5] Indeed, because San Diego Superior Court Judge Gill has already determined that Plaintiff's Fourth Amendment rights were violated on December 17, 2008, the doctrine of collateral estoppel may

17  preclude any argument to the contrary in § 1983 proceedings in this Court. "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in

18  a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Collateral estoppel operates to "relieve parties of the cost and vexation of multiple lawsuits,

19  conserve judicial resources and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* Federal courts hearing section 1983 actions must give collateral estoppel effect to

20  state court judgments. *Id.* Specifically, "[a] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was

21  rendered." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990) ("State law governs the application of collateral

22  estoppel or issue preclusion to a state court judgment in a federal civil rights action"). Under California law, the criteria for application of collateral estoppel in a civil case to issues determined in a prior

23  criminal proceeding are:

24  (1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have

25  been a "full and fair . . . trial" to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered

26  must of necessity have been decided at the criminal trial; and (4) the party against whom collateral estoppel is asserted was a party or in

27  privity with a party at the prior trial.

28  *McGowan v. City of San Diego*, 208 Cal.App.3d 890, 895 (Cal. Ct. App. 1989). *McGowan* holds that the doctrine of collateral estoppel may apply to subsequent civil actions based upon rulings pursuant to motions to suppress evidence under CAL. PENAL CODE § 1538.5. *Id.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  When presented with a qualified immunity defense, the central questions for the court are:  (1) whether the facts alleged, taken in the light most favorable to Plaintiff, demonstrate that the Defendants' conduct violated a statutory or constitutional right;  and (2) whether the right at issue was "clearly established" at the time it is alleged to have been violated.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "These two questions may be considered in either order."  *Rosenbaum v.  Washoe County*, 654 F.3d 1001, 1006 (9th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In this case, all Defendants "assume, arguendo, that Plaintiff can establish that his Fourth ... Amendment rights were violated."  (Defs.' P&As at 11.)  Indeed, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment." *United States v. Becker*, 23 F.3d 1537, 1539 (9th Cir. 1994) (quoting *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884 (9th Cir. 1990)).

Viewing the facts in the record in the light most favorable to Plaintiff, there is indeed no question that at the time Plaintiff was detained and his home was searched on December 17, 2008, "[n]o reasonable officer could claim to be unaware of the basic rule, well-established by [Supreme Court] cases, that, absent consent or exigency," *Groh v. Ramirez*, 540 U.S. 551, 564 (2004), or a "reasonable suspicion that [as] a probationer subject to a search condition[,] [Plaintiff was] engaged in criminal activity," *Knights*, 534 U.S. at 593, that a warrantless search of his home would violate the Fourth Amendment. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010) ("A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment applies.") (citation omitted).  And while Defendants argue that "probable cause existed at the time of search and seizure of the evidence at Marcy Street,"  (Defs.' P&As in Supp. of Mot. for Summ. J. at 13-14), even assuming their suspicions that Plaintiff had "resumed his illicit activities selling drugs in the downtown area" (*id.* at 5-6, 14), amounted to probable cause to arrest him or even to believe his

1   home contained evidence of crime, they still required a warrant before searching it. "It is settled

2   doctrine that probable cause for belief that certain articles subject to seizure are in a dwelling

3   cannot of itself justify a search without a warrant." *Jones v. United States,* 357 U.S. 493, 497-98

4   (1958) (citations omitted).

5          Having concluded that the evidence in the record shows Plaintiff's clearly established

6   Fourth Amendment rights were violated as a matter of law, the Court must next "turn to the

7   question whether [Defendants are] entitled to qualified immunity despite that violation." *Groh*,

8   540 U.S. at 565 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). "This step, in contrast to

9   the first, is an inquiry into the reasonableness of the officer's belief in the *legality* of his actions."

10  *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (emphasis original) (citing

11  *Saucier*, 533 U.S. at 206). An officer will therefore be entitled to qualified immunity even if he

12  was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable.

13  *Anderson v. Creighton*, 483 U.S. 635, 636-37 (1987) (holding that a "law enforcement officer

14  who participates in [conduct] that violates the Fourth Amendment may [not] be held personally

15  liable ... if a reasonable officer could have believed that the [conduct] comported with the Fourth

16  Amendment.").

17         Thus, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable

18  officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202;

19  *Wilkins,* 350 F.3d at 954. "When evaluating whether a law enforcement officer was on notice

20  that his conduct was unlawful in a particular instance, [the court] look[s] only to the

21  'circumstances presented to [the] officer.'" *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005)

22  (quoting *Saucier*, 533 U.S. at 209). "The protection of qualified immunity applies regardless of

23  whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based

24  on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 815 (quoting *Groh*, 540 U.S. at 567

25  (2004) (Kennedy, J., concurring)); *Butz v. Economou*, 438 U.S. 478, 507 (1978) ("Officials will

26  not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law.").

27  "The qualified immunity standard gives ample room for mistaken judgments by protecting all

28  / / /

1    but the plainly incompetent or those who knowingly violate the law." *Liberal v. Estrada*, 632
2    F.3d 1064, 1077 (9th Cir. 2011) (internal citations omitted).

3        Specifically, "[a]n officer is not liable for acting on information supplied by another
4    officer, even if that information later turns out to be wrong, if he has an objectively reasonable,
5    good-faith belief that he is acting pursuant to proper authority." *Espinosa*, 598 F.3d at 535
6    (citing *Motley v. Parks*, 432 F.3d 1072, 1081-82 (9th Cir. 2005 (en banc)). "The lynchpin is
7    whether the officer's reliance on the information was objectively reasonable." *Id.*

8        The only question left, then, is whether it was reasonable for Defendant Botkin to rely on
9    his December 4, 2008 SD-Law Database inquiry to justify a warrantless search of Plaintiff's
10   home on December 17, 2008, and whether it was further reasonable, under the circumstances,
11   for Defendants Zdunich, Iverson, Adams, Griffin and Johnson to rely on Officer Botkin's
12   representations before detaining Plaintiff and participating in that search. *Wilkins*, 350 F.3d at
13   955 (noting that where "there is no question whether the officers [seeking qualified immunity]
14   ... violated clearly established law[,] ... [t]he only question for resolution is whether their
15   [mistaken] belief in the [lawfulness] of their actions was objectively reasonable.").[6] "The
16   principles of qualified immunity shield an officer from personal liability when an officer
17   reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244;
18   *Ammons v. Washington Dept. of Social Servs.,* 648 F.3d 1020, 1026 (9th Cir. 2011).

19       However, if the reasonableness of the officer's belief that his conduct was lawful
20   "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate."
21   *Wilkins*, 350 F.3d at 1110-11 (citing *Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring)); *Porter*
22   *v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) ("If a genuine issue of material fact exists that

23

24       [6]   While the Supreme Court has held that "the same standard of objective reasonableness ...
25   applied in the context of a suppression hearing in [*United States v.*] *Leon*[,] [468 U.S. 897 (1984)]
     defines the qualified immunity accorded an officer," *Groh*, 540 U.S. at 565 n.8 (citing *Malley v. Briggs*,
     475 U.S. 335, 344 (1986)), in a § 1983 action, "individual civil liability is at issue." *Ingram v. City of*
26   *Los Angeles*, 418 F. Supp. 2d 1182, 1190-91 (C.D. Cal. 2006), *aff'd,* 331 Fed. Appx. 462 (9th Cir.
     2009). "[E]ach Government official ... is only liable [under 42 U.S.C. § 1983] for his or her own
27   misconduct." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948-49 (2009). Plaintiff must present sufficient
     evidence to warrant a reasonable inference that specific officers are responsible for his injuries.
28   *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986), *abrogated on other grounds by*
     *Graham*, 490 U.S. 386.

1  prevents a determination of qualified immunity at summary judgment, the case must proceed to

2  trial.") (citation omitted).

3  **4.  Application of Qualified Immunity Defense to Individual Defendants**

4  Defendants Botkin, Griffin and Johnson argue "there is no dispute that [they] acted with

5  objective reasonableness when they searched Plaintiff's residence," because they were "well

6  aware Plaintiff was a known drug dealer," they "had received tips Plaintiff was engaged in

7  selling marijuana and robbing citizens," he was a "known felon" and "most importantly, they

8  objectively believed Plaintiff had a Fourth Waiver which entitled them to search his residence

9  without a warrant." (Defs.' P&As at 12.)  Defendant Zdunich claims he is entitled to qualified

10  immunity because there "is no evidence that the [traffic] stop [he conducted] was illegal or that

11  he participated in the search of any of Plaintiff's property." (*Id.* at 15.)  Finally, Defendants

12  Adams, Iverson and Millett claim because they "did not participate" in the search of Plaintiff's

13  residence, each of them "should be dismissed as defendants." (*Id.*)

14  Plaintiff, however, argues that it was objectively unreasonable for any Defendant to rely

15  on the December 4, 2008 SD-Law Database inquiry to justify their part in the December 17,

16  2008 search of his home because Defendants' own exhibit indicates his Fourth Waiver had

17  expired. (Pl.'s Mem. of P&As in Supp. of Opp'n at 18.)  Plaintiff further argues that Defendants

18  knew 2 hours *before* the search on December 17, 2008, that his Fourth Waiver had expired, yet

19  still conspired to conduct an "illegal traffic stop," to "illegally [d]etain[] [him] for 45 minutes,"

20  and "illegally" search his home. (*Id.* at 11-12; *see also* Pl.'s Decl. in Supp. of Opp'n at 5.)

21  Plaintiff bases these arguments on a printout of the SD-Law Database dated December 17, 2008

22  (Pl.'s Opp'n , Ex. 2 at 9-11), and his claims to have told Officer Zdunich when he was first

23  pulled over on December 17, 2008, that "he was not a Fourth waiver." (Pl.'s P&As in Supp. of

24  Opp'n at 11.)

25  **a.  Defendant Botkin**

26  While Sergeant Griffin "was in charge of Team 8 on December 17, 2008," (Griffin Decl.

27  ¶ 5), Officer Botkin "headed up the investigation into Plaintiff's illicit activities," (*id.* ¶ 10),

28  which included running a "Fourth Amendment waiver search on December 4, 2008 on the SD-

Law Database." (Botkin Decl. ¶ 10.) Botkin claims that he "entered Plaintiff's name and date of birth and other information in the database and hit 'return.'" (*Id.* ¶ 12.) The computer screen "revealed a series of names," and "Plaintiff's name came up several times." (*Id.*; see also Defs.' Notice of Lodgment in Supp. of Mot. for Summ. J. [ECF No. 49-11], Ex. 1 at 2-3.) Botkin claims that "[n]ext to Mr. Dowell's name, in the top right hand corner, [and] above his date of birth," the database "contained wording which said, 'Has Fourth Waiver' or 'Fourth Waiver.'" (Botkin Decl. ¶ 12.) Botkin claims he "clicked on that information and it stated again in the right hand corner that Plaintiff had a Fourth Waiver." (*Id.*) Botkin claims he "did not see any expiration date listed on this computer screen." (*Id.*) Defendants' Exhibit 1, which appears to be a printout of from the SD-Law Database search Botkin conducted on December 4, 2008, corroborates his claim--specifically, the page entitled "RI01 Result" does include a notation, in the far right column and next to Plaintiff's name which reads: "HAS 4TH WAIVER." (Defs.' Notice of Lodgment in Supp. of Mot. for Summ. J. [ECF No. 49-11], Ex. 1 at 3.) However, the next page, also dated December 4, 2008 and entitled "DA09 Result," appears to contain a list of Plaintiff's individual court cases, along with a notation at the top of the list in the right-hand column, which reads: "4TH EXPIRE." (*Id.* at 4.)

During Plaintiff's suppression hearing, Botkin admitted that in his experience, the database "will show [the] expiration date if you click on the link to the specific case [to which] the Fourth Waiver has been assigned." (Defs.' Ex. 2 [ECF No. 49-12] at 36.) Botkin admitted that it wasn't until *after* Plaintiff's residence was searched on December 17, 2008 that he "looked at all the court cases ... to determine why it no longer showed a valid Fourth Waiver." (*Id.*) Botkin could not explain during the suppression hearing why the database did not show any Fourth Waiver on December 17th, but speculated that it "may have been either removed ... by the court or redacted by the person who maintains th[e] records on the computer," as a result of Plaintiff having a "court appearance between the 4th and the 17th." (*Id.* at 37.) Botkin admits that he "made a mistake" and "should have checked [the database] prior to the search to determine whether Plaintiff still had a Fourth Waiver on December 17, 2008," instead of "rel[ying] on [his] December 4, 2008 search." (*Id.* ¶ 22.)

The Court agrees and further finds that the evidence in the record before it reveals a genuine issue of material fact as to whether Officer Botkin's mistake was reasonable under the circumstances. *See Anderson,* 483 U.S. at 638; *Rosenbaum,* 654 F.3d at 1010. "The law [of qualified immunity] acknowledges that an otherwise competent officer will sometimes make an unreasonable decision or make an unreasonable mistake as to the law or fact. In those instances, the officer [may be held] liable under § 1983." *Rosenbaum,* 654 F.3d at 1009 (citing *Liberal v. Estrada,* 632 F.3d 1064, 1078 (9th Cir. 2011) (affirming district court's denial of qualified immunity to officer on summary judgment finding his mistake of fact was unreasonable)).

As the person whose job it was to "lead" Team 8's investigation into Plaintiff's possible criminal activity, Botkin was "responsible for ensuring that they ha[d] lawful authority for their actions." *Motley,* 432 F.3d at 1081 (citation omitted). In this case, a reasonable trier of fact could conclude, based on his December 4, 2008 review of the RI01 Result page in SD-Law Database, which *did* indicate that Plaintiff had a Fourth Waiver, when coupled with his knowledge of Plaintiff's arrest in the summer of 2008 "for selling cocaine," and the November 2008 tip received by Team 8 members that Plaintiff "was dealing marijuana and assaulting and robbing downtown residents," (Botkin Decl. ¶¶ 8-9; Defs.' Ex. 1 at 3), that Botkin's conclusion that Plaintiff's residence could be searched without a warrant was an objectively reasonable one. *Wilkins,* 350 F.3d at 955; *Anderson,* 483 U.S. at 636-37. On the other hand, a reasonable trier of fact could also conclude it was objectively unreasonable for Botkin not to further review the DA09 Result screen in the SD-Law Database on December 4, 2008, which included a notation that Plaintiff's Fourth Waiver had expired (Defs.' Ex. 1 at 4), or that it was unreasonable for him not to confirm his original findings in the database two weeks later on December 17, 2008, before he led a team in detaining Plaintiff and conducting a warrantless search of his home. Evidence in the record suggests, and a reasonable jury could find, that had he done this, Botkin might have noticed the SD-Law Database RI01 Result page no longer included any indication of an active Fourth Waiver. *See* Pl.'s Opp'n, Ex. 2 at 10; *Wilkins,* 350 F.3d at 955; *Anderson,* 483 U.S. at 636-37.

/ / /

Thus, because the reasonableness of Botkin's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins*, 350 F.3d at 1110-11 (citing *Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring)); *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) ("If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial.") (citation omitted).

### b.    Defendant Zdunich

Defendant Zdunich claims he is entitled to qualified immunity as to Plaintiff's Fourth Amendment claims because there "is no evidence that the [traffic] stop [he conducted] was illegal or that he participated in the search of any of Plaintiff's property." (Defs.' P&As at 15.)

Evidence in the record before the Court shows that on December 17, 2008, Zdunich was a "uniformed scoop officer" and was directed by Officer Botkin to locate and detain Plaintiff in order to "conduct a 4th waiver search of his person." (Zdunich Decl. ¶¶ 9-10; Defs.' Ex. 2 at 12, 34.) At approximately 5:34 p.m., Officer Adams observed Plaintiff driving a white pickup truck and called Officer Zdunich in to make a traffic stop. (Adams Decl. ¶ 3; Defs.' Ex. 2 at 14.) In addition to being told by Botkin that Plaintiff had a Fourth Waiver, however, Zdunich claims he also observed the white truck Plaintiff was driving "had a cracked right taillight," which is a Vehicle Code violation. (Defs.' Ex. 2 at 8-9; Zdunich Decl. ¶ 10.) Zdunich claims he pulled Plaintiff over, asked for his drivers' license, ordered him out of the car, and because he believed Plaintiff had a Fourth Waiver, "searched him," "took his house keys off of him, [and] placed him in the back of [his] car." (Defs.' Ex. 2 at 9-10.) Zdunich detained Plaintiff in the back of his vehicle for approximately 45 minutes while Officers Griffin, Botkin and Johnson conducted the search of his home. (*Id.* at 11.)

Defendant Zdunich is correct insofar as he argues that his initial detention on December 17, 2008, *i.e.*, the traffic stop, was lawful. During Plaintiff's § 1538.5 hearing, and in his affidavit offered in support of summary judgment, Zdunich testified that he had been informed and believed Plaintiff had significantly diminished privacy rights as a result of a probation condition, which would have justified his detention, *see Knights*, 534 U.S. at 119-20, *and that*

1   Plaintiff was driving a truck with a broken taillight–which also would have justified his initial

2   detention. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the

3   decision to stop an automobile is reasonable [under the Fourth Amendment] where the police

4   have probable cause to believe that a traffic violation has occurred.") (citations omitted).

5       However, an "investigative detention must be temporary and last no longer than is

6   necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983)

7   (plurality opinion). Thus, without some further justification, Zdunich could not prolong

8   Plaintiff's traffic stop "any longer than necessary to effectuate the purpose of the initial stop."

9   *Royer*, 460 U.S. at 500; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is

10   justified solely by the interest in issuing a warning ticket to the driver can become unlawful if

11   it is prolonged beyond the time reasonably required to complete that mission.") (citing *United*

12   *States v. Jacobsen*, 466 U.S. 109, 124 (1984)).

13       In this case, Zdunich admits he detained Plaintiff for approximately 45 minutes while

14   Defendant Iverson arrived, took Plaintiff's keys, used them to gain entry, and while Defendants

15   Griffin, Botkin and Johnson conducted the search of Plaintiff's home.[7] (*See* Defs.' Ex. 2 at 9-

16   11.) This was clearly "longer than necessary" to issue a mere traffic citation. *See United States*

17   *v. Motley*, 344 Fed. Appx. 445, 446 (9th Cir. 2009) (finding traffic stop lasting "roughly 50 fifty

18   minutes, at least fifteen to twenty of which were related to the traffic stop, and the remainder of

19   which were spent awaiting the arrival of a narcotics-detention dog," an unreasonably prolonged

20   detention under the Fourth Amendment). Thus, once Defendant Zdunich detained Plaintiff past

21   the point necessary to ascertain his identity and issue him a citation for a broken taillight,

22   _____

23       [7] Plaintiff alleges when Zdunich "ordered [him] to get out of the vehicle," he also "subject[ed] [him] to a Fourth Waiver search." (Pl.'s Opp'n at 11.) When Zdunich testified at Plaintiff's preliminary

24   hearing, he admitted that because Botkin told him Plaintiff had a Fourth Waiver, he "searched him[,] ... took his keys off him[,] [and] placed him in the back of [his] car." (Defs.' Ex. 2 at 10.) Because

25   Plaintiff did *not* have Fourth Waiver, however, Zdunich was not authorized to search Plaintiff or even pat him down unless Zdunich had reasonable suspicion to believe Plaintiff was "armed and dangerous."

26   *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (holding that police may order a driver to exit the vehicle and pat him down for weapons if the officer

27   reasonably concludes that the driver "might be armed and presently dangerous")). Plaintiff does not specifically challenge the validity of Zdunich's pat down; however, evidence in the record does suggest

28   that Zdunich may have had some reason to believe he may have been armed and dangerous. *See* Zdunich Decl. ¶¶ 7, 16 (describing November 2008 tips to Team 8 informants that Plaintiff was "selling drugs," "assaulting them and threatening them with a handgun.").

1  Zdunich violated the Fourth Amendment, unless he had some other valid justification for
2  prolonging Plaintiff's detention.  Indeed, San Diego Superior Court Judge Gill made this
3  determination during Plaintiff's suppression hearing.  *See* Defs.' Ex. 2 at 43:7-8 ("The detention
4  for 45 minutes was not reasonable.").

5      Notwithstanding this violation, Zdunich claims he is entitled to qualified immunity
6  because while he did not conduct his own search of the SD-Law Database, he had personally
7  "accessed this database approximately 1,000 times in [his] career," and "had no reason to doubt"
8  it when Officer Botkin told him his search of the database showed Plaintiff had a Fourth Waiver.
9  (Zdunich Decl. ¶¶ 9-10.)  This assumption was especially reasonable , Zdunich asserts, since it
10  was "coupled with the fact that Plaintiff was out on bond while he was awaiting trial." (*Id.* ¶ 9.)

11      "Effective law enforcement requires cooperation and division of labor to function.  For
12  that reason, law enforcement officers are generally entitled to rely on information obtained from
13  fellow law enforcement officers."  *Motley,* 432 F.3d at 1081 (citing  *Whiteley v. Warden,*
14  *Wyoming State Penitentiary*, 401 U.S. 560, 568 (1971)).  "All officers, however, have an
15  ongoing duty to make appropriate inquiries regarding the facts received and to further investigate
16  if insufficient details are relayed."  *Id.* (citation omitted).

17      Thus, Zdunich may be entitled to qualified immunity despite violating Plaintiff's Fourth
18  Amendment rights if uncontroverted evidence in the record shows, as a matter of law, that he
19  had an "objectively reasonable, good-faith belief that he [wa]s acting pursuant to proper
20  authority," even "if the information supplied by [Botkin] turn[ed] out to be erroneous." *Id.* at
21  1082 (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)); *Torres v. City of Los Angeles,*
22  548 F.3d 1197, 1212 (9th Cir. 2008).  In this regard, Zdunich claims he had "no reason to doubt
23  Officer Botkin," at the time he initiated Plaintiff's traffic stop and prolonged his detention.
24  (Zdunich Decl. ¶ 9.)  However, Plaintiff claims he "told [Zdunich] that he was not a 4th waiver"
25  at the time Zdunich ordered him to exit his vehicle.  *See* Pl.'s P&A's in Supp. of Opp'n at 11.
26  At this point, Plaintiff argues, it was incumbent upon Zdunich to "make appropriate inquiries"
27  or to "further investigate" into Plaintiff's probationary status before detaining him further.
28  *Motley*, 432 F.3d at 1081.

Viewing the evidence in the light most favorable to Plaintiff, the Court also finds genuine issues of material fact exist as to whether Officer Zdunich had a "good-faith belief" that prolonging Plaintiff's traffic stop, obtaining his keys and detaining him for 45 minutes while other members of Team 8 conducted a search of Plaintiff's home was "objectively reasonable" once Plaintiff allegedly told him he was not subject to any Fourth Waiver during the traffic stop. *Id.* at 1082 (finding "officers entitled to maintain belief" in the lawfulness of their actions until "presented with convincing evidence that the information they had relied upon was incorrect.") (citation omitted); *Espinosa*, 598 F.3d at 536 (finding officers who conducted warrantless entry and search of apartment based on information relayed by another officer were not entitled to qualified immunity because material issues of fact remained as to the reasonableness of their reliance); *Torres*, 548 F.3d at 1212 (finding triable issues as to whether a reasonable officer would have relied on information possessed by others without further verification).

### c.    Defendants Griffin and Johnson

Defendants Griffin and Johnson, who joined Officer Botkin in searching Plaintiff's home, also claim they are entitled to qualified immunity because they "legitimately believed that Plaintiff had a Fourth Waiver and a warrant was [therefore] not needed to search his home." (Defs.' P&As in Supp. of Summ. J. at 12.)

Sergeant Griffin admits that while Officer Botkin "headed up the investigation into Plaintiff's illicit activities," (Griffin Decl. ¶ 10), he was the Sergeant "in charge of Team 8 on December 17, 2008." (*Id.* ¶ 5.)  Griffin further admits that he, like the other officers, relied on Officer's Botkin's representations that Plaintiff had a Fourth Waiver, and "was convinced," based on Botkin's December 4, 2008 SD-Law Database search, his knowledge that Plaintiff "was out on bond while he was awaiting trial," and informants' tips to Team 8, that Plaintiff was engaging in "illegal activities."  Griffin thus argues he reasonably believed there was "no need to seek a warrant" before he gave the order to Zdunich to detain Plaintiff, obtain his keys and search his home on December 17, 2008.  (*Id.* ¶¶ 11-12.)  Griffin claims it was not until he, Botkin, and Officer Johnson had already searched Plaintiff's home and confiscated marijuana, a drug scale, and a handgun that he "heard Officer Botkin ask ... [Defendant] Adams to re-check

the database to confirm [Plaintiff] was still on probation and subject to a Fourth Waiver." (*Id.* ¶ 16-18.)  While no evidence in the record reveals what prompted Botkin to ask Adams to double-check the database during the search, Griffin claims he was "stunned" when Adams indicated "the computer system ... indicated [Plaintiff] was not on probation any longer." (*Id.* ¶ 18.)  At this point, Griffin claims they terminated the search, and returned to the Central Division Police Station where another search of the SD Law Database revealed that "Plaintiff's Fourth Waiver was 'expired' or no longer in the ... database." (*Id.* ¶¶ 18-19.)

Like Sergeant Griffin and Officer Zdunich, Officer Johnson, along with Botkin and Griffin, searched Plaintiff's home on December 17, 2008, and relied on Botkin who had "advised [him] that the SD-Law Database showed that Plaintiff had a Fourth Waiver."  Based on this information, as well as Johnson's knowledge of Plaintiff's summer arrest, subsequent informant tips, his own involvement in Team 8's investigations into Plaintiff's "illicit activities," and "the fact that Plaintiff was out on bond while he was awaiting trial," Johnson also believed "there was no need to seek a warrant." (Johnson Decl. ¶¶ 11, 12, 14, 20.)

First, the Court finds no evidence in the record to suggest that Officer Johnson's reliance on Botkin's representations was objectively unreasonable under the circumstances presented to him.  *Motley*, 432 F.3d at 1082.  Unlike Officer Zdunich, Johnson did not have any pre-search interaction with Plaintiff which may have given him reason to believe Botkin's review of the SD-Law Database was flawed.  Therefore, he had no obligation to "make reasonable inquires to determine if there [was] a sufficient basis for the entry and search," and is entitled to qualified immunity.  *Espinosa*, 598 F.3d at 535 (citing *Motley*, 432 F.3d at 1081-82).

Sergeant Griffin, however, admits to having been "in charge" of Team 8 on December 17, 2008.  Therefore, he, like Botkin, was "responsible for ensuring that they ha[d] lawful authority for their actions."  *Ramirez,* 298 F.3d at 1027.  Nevertheless, unless Griffin had "some indication ... that an investigation was inadequate or incompetent, [he was] not obliged to either undertake *de novo* investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent.'"  *Motley*, 432 F.2d at 1081 (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992)).

1    In this regard, Plaintiff points to what appears to be a computer printout of a SD-Law

2  Database search entry for Plaintiff's records dated December 17, 2008.  (Pl.'s Opp'n [ECF No.

3  60-2] Ex. 2.)  At the top of the first screen, the database user is identified as William Griffin,

4  whose "last sign in" was on 12/17/2008 at 3:44:27 p.m.  (*Id.* at 9.)  The "RI01 Result" page,

5  unlike the one Defendant Botkin claims indicated Plaintiff had a Fourth Waiver on December

6  4, 2008, includes no such notation.  (*Id.* at 10; *cf.* Pl.'s Opp'n Ex. 1 [ECF No. 60-2] at 4.)

7  Moreover, the "DA09 Result" page, also dated December 17, 2008, includes the notation "4th

8  Expire" next to a list of all Plaintiff's individual cases.  (Pl.'s Ex. 2 [ECF No. 60-2] at 11.)

9  Plaintiff claims that this evidence shows that Sgt. Griffin knew at 3:44 p.m., almost two hours

10  before the search of Plaintiff's home, that he had no search waiver.  (Pl.'s Opp'n [ECF No. 60]

11  at 18.)  Defendants counter that this document "only reflects the last time Sgt. Griffin logged into

12  the SD-Law Database," and does not affirmatively prove that Griffin "logged into the system

13  to investigate Plaintiff's Fourth waiver."  (Defs.' Reply [ECF No. 61] at 6-7.)

14    Taken in the light most favorable to Plaintiff, however, the Court finds that a material

15  issue of fact exists as to whether, based on this evidence, Griffin may have had a pre-search

16  reason to believe, or at least the opportunity to confirm, whether Officer Botkin's December 4,

17  2008 SD-Law Database search result was "inadequate or incompetent."  *Motley*, 432 F.2d at

18  1081; *see also Torres*, 548 F.3d 1212 (finding detectives not entitled to summary judgment as

19  a matter of law when material issues of fact existed as to "whether a reasonable officer would

20  have relied on [information from fellow officers] without further verification.") (citation

21  omitted).  For this reason, the Court finds Sergeant Griffin's claim to qualified immunity, like

22  Officer Botkin's and Zdunich's, must be denied.

23             **d.    Defendants Iverson and Adams**

24    Defendants Iverson and Adams also seek qualified immunity on grounds that they "were

25  not involved" and "did not participate" in the search of Plaintiff's home. (Defs.' P&As in Supp.

26  of Summ. J. at 14-15; Defs.' Reply at 7.)

27  / / /

28  / / /

Evidence in the record before the Court confirms that Defendant Iverson's role on December 17, 2008 was to collect Plaintiff's keys from Officer Zdunich and stand guard near the doorway "to prevent something unexpected from occurring" while Botkin, Griffin and Johnson searched the residence. (Iverson Decl. ¶¶ 11-13.) Iverson did not physically search inside Plaintiff's home. (Griffin Decl. ¶¶ 14-15; Botkin Decl. ¶ 17; Johnson Decl. ¶ 16.) Iverson also did not conduct her own SD Law Database search of Plaintiff's records, but instead, like Griffin, Zdunich, and Johnson, "relied on the representations of Officer Botkin," and had "no reason to doubt" that Plaintiff had a valid Fourth Waiver. (Iverson Decl. ¶ 9.)

Plaintiff cannot hold either Officer Iverson or Adams liable merely because of their Team 8 membership without showing individual participation in the unlawful conduct. *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). Liability under § 1983 may not be premised on "team liability" or a "team effort." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002). Thus, in order to survive summary judgment, Plaintiff must point to evidence in the record sufficient to show that both Iverson and Adams were an "integral participant" in the Fourth Amendment violation. *Chuman*, 76 F.3d at 294-95. "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Co.*, 374 F.3d 773, 780 (9th Cir. 2004). However, it does require "some fundamental involvement in the conduct that allegedly caused the violation." *Jones*, 297 F.3d at 936.

The record before the Court shows Officer Iverson reported to the scene of Plaintiff's traffic stop and detention, retrieved Plaintiff's house keys from Officer Zdunich, "brought them to Plaintiff's residence," used them to open the front door, and then "stood guard near the doorway" while Botkin, Griffin and Johnson conducted the search. (Iverson Decl. ¶¶ 11-13.) "Under the integral participant rule, 'an officer who does not enter an apartment, but *stands at the door, armed with his gun*, while others conduct the search, can ... be a 'full, active participant' in the search," and therefore, subject to liability if the constitution is violated. *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009) (quoting *Boyd*, 374 F.3d at 780) (emphasis original). However, while evidence in the record shows that Iverson was more than a "mere bystander," *Boyd*, 374 F.3d at 837, no triable issues of fact exist to show that she, like

1   Officer Johnson, had any reason to believe or even suspect that Plaintiff was *not* subject to a

2   valid Fourth waiver at the time.  Because no evidence in the record suggests that Iverson's

3   reliance on Botkin's representations was objectively unreasonable, she, like Officer Johnson, is

4   entitled to qualified immunity.  *Motley*, 432 F.3d at 1082.

5        In his Declaration, Officer Adams claims he "ha[s] no idea why [he is] named as

6   Defendant" (Adams Decl. ¶ 3), and counsel for Defendants further asserts it is "unbelievable that

7   Plaintiff named Officer Adams as a defendant ... [since his] only alleged participation in the

8   matter was advising Officer Botkin that Plaintiff's Fourth waiver possibly was no longer in the

9   SD Law Database."  (Defs.' P&As in Supp. of Summ. J. at 15; Griffin Decl. ¶ 15.)  However,

10   Officer Zdunich testified under oath at Plaintiff's January 5, 2009 preliminary and Penal Code

11   § 1538.5 hearing that while it was Officer Botkin who first advised him of Plaintiff's Fourth

12   waiver and who "directed [him] to stop Plaintiff and conduct a 4th waiver search of his person,"

13   (Defs. Ex. 2 at 6, 12; *see also* Zdunich Decl. ¶¶ 8-10), it was Adams who first observed Plaintiff

14   driving his white pickup on December 17, 2008 and who "called [Zdunich] in to make the traffic

15   stop."  (Defs.' Ex. 2 at 14.)  Adams admits that while he was a member of Team 8 on December

16   17, 2008, and did "participate[] in [Plaintiff's] arrest ... in the summer of 2008," he "was not

17   involved in the search of Plaintiff's residence" on December 17, 2008 and "was not present at

18   the alleged search" on that day.  (Adams Decl. ¶ 3.)  Sgt. Griffin, however, claims that "[w]hile

19   at Dowell's residence, [he] heard Officer Botkin ask Team 8 member Officer Simon Adams to

20   re-check the database to confirm [Plaintiff] was still on probation and subject to a Fourth waiver

21   search."  (Griffin Decl. ¶ 18.)  Thus, Griffin claims it was Adams on December 17, 2008 who

22   "told [them] the computer system now indicated [Plaintiff] was not on probation any longer."

23   (Griffin Decl. ¶ 18.)

24        Thus, it appears that while Adams may have played a peripheral support role to Team 8

25   on December 17, 2008 by serving in some surveillance capacity prior to Plaintiff's traffic stop,

26   and to have been a radio presence after and during the search of Plaintiff's home, no evidence

27   in the record shows Adams had any personal interaction with Plaintiff or was physically present

28   either during Plaintiff's detention or the search of his home.  Based on this lack of evidence, the

1  Court finds no rational trier of fact could find that Adams was an "integral participant" in the

2  violation of Plaintiff's Fourth Amendment rights.  *See Chuman*, 76 F.3d at 294-95; *Motley*, 432

3  F.3d at 1082 (affirming grant of summary judgment in  favor of ATF agent who "did not

4  participate in the search of the premises.").  Accordingly, Defendant Adams is also entitled to

5  summary judgment as a matter of law.

6  **e.   Defendant Millett**

7  Finally, in his Amended Complaint, Plaintiff alleges Defendant Millett "generated a letter

8  to [Plaintiff's] landlord" informing him or her that San Diego Police had "conducted a narcotic

9  investigation at the property," and that as a result, he was evicted.  (Amend. Compl. at 12.)

10  Millett claims she is entitled to summary judgment because "there is absolutely no nexis"

11  between her role as member of the City's Drug Abatement Response Team and "the search of

12  Plaintiff's property."  Millett claims her "only involvement in this case occurred when her

13  secretary sent a form letter to Plaintiff's landlord on January 29, 2009" notifying him or her that

14  "drug-related activity had taken place on the property."  (Defs.' P&As in Supp. of Summ. J. at

15  15; Millett Decl. ¶¶ 5-6.)

16  The Court finds no evidence in the record to show Millett's conduct violated Plaintiff's

17  constitutional rights.  *Saucier*, 533 U.S. at 201.  The mere fact that Millett notified Plaintiff's

18  landlord that drugs had been found on his property more than a month after he was arrested and

19  charged, and after the evidence had already been suppressed and charges were dismissed in San

20  Diego Superior Court Case No. CD217839, does not violate any legitimate expectation of

21  privacy.  *See Arizona v. Evans*, 514 U.S. 1, 10 (1995) ("[T]he use of the fruits of a past unlawful

22  search ... 'work[s] no new Fourth Amendment wrong.'") (quoting *Leon*, 468 U.S. at 906); *see

23  also Atwater v. City of Lago Vista*, 532 U.S. 318, 365 (2001) ("[T]he fact of the arrest is a

24  permanent part of the public record."); *Paul v. Davis*, 424 U.S. 693, 713 (1976) (right to privacy

25  did not protect arrestee from disclosure of record of his arrest); *Doe v. City of New York*, 15 F.3d

26  264, 268 (2d Cir. 1994) ("Certainly, there is no question that an individual cannot expect to have

27  a constitutionally protected privacy interest in matters of public record.").

28  / / /

1   Thus, because no evidence in the record support Plaintiff's allegations that Defendant
2   Millett caused any constitutional violation, or was an "integral participant" in the violation of
3   Plaintiff's Fourth Amendment rights on December 17, 2008, *Chuman*, 76 F.3d at 294-95, "there
4   is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

### IV.

### CONCLUSION AND ORDER

7   Based on the foregoing, Defendants' Motion for Summary Judgment (ECF No. 49) is
8   GRANTED as to Defendants Johnson, Iverson, Adams and Millett and DENIED as to
9   Defendants Botkin, Zdunich and Griffin.

10   **IT IS SO ORDERED**.

11   DATED:  November 8, 2011

_____
HON. DANA M. SABRAW
United States District Judge